Good afternoon, Your Honors. Floyd Weissner for Plaintiffs. May it please the Court. Your Honors, I realize I picked this fight by filing a Notice of Appeal here, but I think I may have jumped the gun because I think the Notice of Appeal is premature for the reason that the District Court clearly did not dispose of all claims against all parties. What's so clear about that, since the District Court said it was disposing of all? It did, but if you look at the motion, Your Honor, that Honeywell and Hamilton-Sunstrand filed, it was for Counts 1 and 4 of the Second Amendment complaint. There was a Third Amendment complaint on file at that time with a Count 5, which had different allegations. That was never responded to by the defendants, and more importantly, never ruled upon or even discussed by the District. We have said that a decision is final and appealable when the District Judge says, I'm done. Because otherwise, if the District Judge says, I'm done when there are more issues to be resolved, it wouldn't be possible to appeal and ask us to tell the District Court to finish the job. So why isn't this case covered by that principle? When the District Judge says, I'm done, then an appeal lies. Well, Your Honor, respectfully, I think that the District Court can only decide what's before it. And when you have a defendant that moves to a certain specific relief, Counts 1 to 4 of the Second Amendment complaint, and does nothing more, the District Court, in saying, I'm done, is done with what it was presented with. And that's the argument. Well, actually, of course, the District Court, first of all, is entitled to reach other grounds. Usually there would be notice given if further ground is being given. But the point is, that would just be a procedural mistake. I read Judge Ellis' opinion. She says, she's finished with this case. Judgment is entered in favor of defendants. She wouldn't be saying, judgment is entered, if she didn't mean, I'm finished. Point taken, Your Honor. I understand that. I still submit that she can only decide what was before, and she wasn't asked to decide what was before. No, and I've just said, maybe that's not so. The whole case is before her, and your opponents actually also make the argument that this additional count that you're referring to really just raises the possibility of punitive damages, which isn't really a separate theory of relief in any event. They do make that point, and it's not correct. If you look at Count 5, there are very different factual allegations in there about the sale of the GPWS to the initial purchaser, rather than the eGPWS, the Enhanced Ground Proximity Warning System. Those are greatly different allegations, which were never responded to and never decided. So, do you want to move forward with this appeal? No, I think it should be sent back to the district court. I think this court raised it. If we have no jurisdiction, we can't send anything back to the district court. We can only dismiss the appeal. Correct. And of course, if you sincerely believe there's no jurisdiction, you can dismiss the appeal. Right, that's why. Okay. So, is that your motion? No. That's why I was asking. I understand. I understand. Thank you, Your Honor. I'd rather move forward with my argument. But why? If you think we don't have jurisdiction, what could we possibly do for you? Well, good point, Your Honor, but obviously the court feels otherwise, so I would like to take the opportunity to address my other points. Well, you're more than welcome to do that. Thank you, Your Honor. Your Honor, I think there's another larger issue that this court doesn't have federal jurisdiction, and the court may scoff at that, but I think there's a valid point there. We're only here because of the fact that defendants filed a third-party complaint against Air Services Australia, a foreign sovereign entity. So I have a point of clarification for you. Yes, Your Honor. Air Services Australia, ASA, is brought in as a third-party defendant. The Foreign Sovereign Immunities Act is quite clear about that, and I'm not sure whether you envision a merits ruling on the third-party complaint in the federal district court and then a remand, or whether you envision a remand to the state court, which you then predict is going to look at this part of the case and say that it's either too late or that there's something else wrong with it. So what do you actually see happening here if you were to prevail? If I were to prevail, I see happening that the case is remanded to the Circuit Court of Cook County for a merits decision by the Circuit Court of Cook County. Well, see, that's a big problem, if that's what you think, because the Foreign Sovereign Immunities Act couldn't be more clear that foreign sovereigns have a right to be in federal court. And I don't see, I mean, if the claim against ASA were so frivolous as to fail the Bell versus Hood standard or something like that, I could imagine the federal court just dismissing the foreign sovereign, at which point the reason to be in federal court would be gone, perhaps there would be room for a remand. But I don't think you've made that kind of a claim. Well, Your Honor, I think implicit in a decision to remand is that there is no basis for this third-party claim against ASA. But we wouldn't be saying that. See, that's kind of my option one. Do you want the district court to have jurisdiction over the claim against ASA adjudicated? Apparently there are arguments that both sides might make about that. And then, if it should wind up concluding that ASA should, I mean, actually statute of limitations is a loss on the merits, that's not just dismissing the case, saying you don't have a claim anymore. I just don't see any scenario in which you can give to the circuit court of Cook County the authority to make the adjudication on this claim. I see your point, and probably I stand correct on that. I think you're probably right. But I think that the district court in ruling on the motion to remand would have to decide that. It can't sidestep that issue by saying fact question. It's not a fact question. If there's no facts in dispute, then it's a matter of law, and the district court should decide whether there is a claim, a valid claim against ASA and not barred by the statute of limitations. The district court should make that decision. But that means federal jurisdiction is fine over the whole case because cases get removed, not individual claims. And so if ASA has invoked its right under the FSIA to remove the whole case, the case remains before the district court, even if this one claim is resolved. I see your point, Your Honor. But I think that as a practical matter, we have to look at it in a practical sense. What's going to happen if the district court properly considers the motion to remand and the issue about whether it's barred by the statute of limitations? If it does that, there's not going to be any case against ASA to go back to state court. We don't have to worry about concerns of federal jurisdiction for ASA. But the fact is, if this case – this is a little bit unusual because normally if you had a diversity case or an alien case with an in-state defendant, you wouldn't be removing. But this case has been removed on a different ground. And otherwise, what's wrong with jurisdiction in the district court? It looks to me like citizens of Australia are suing various entities. There's actually a defective jurisdictional allegation here because people are talking about Mr. Hyer's residence, but I will overlook that for the moment. Suing citizens of various places in the United States, that looks like a perfectly good diversity case, 1332 case. It is, but for the foreign resident rule, it wouldn't be in this court. But no, that's not how it came to the court, though. I mean, it's an unusual case. No one tried to remove based on the in-state defendant. And you would agree, would you not, that if the case had originally been filed in the federal district court, jurisdiction would have been clearly present. I would agree with that. Okay. But it was not. It was remanded at one point and then came back years later.  I think there is a public policy consideration here too, Your Honor. There's a concern, obviously, for giving ASA its right to a federal forum, but isn't there also a concern about manipulation of jurisdiction? And I really believe that's what's occurring here. Why is it manipulating jurisdiction? Well, when you file a claim against a foreign sovereign two years too late under any standard, four years after I filed my complaint, knowing that they're going to remove it to federal court and that will give you your federal jurisdiction, when you really don't want to proceed, you're not going to collect any judgment against ASA. You just want to get to this federal court and you want to deprive plaintiffs of their chosen forum. That arguably is manipulation of jurisdiction, and I think there is a public policy in favor of that. Otherwise, you're going to have a situation where any time a defendant wants to be in federal court, find a foreign sovereign and file a third-party complaint against them. They're not that plentiful. And I do think there are a fair number of them out there, but not that many. The point I'm going to make is that the removal statute itself contemplates the occurrence of events post-filing of the original suit that might make something removable that was not originally removable, and that's all that's happened here. So I don't know. Maybe you consider all such events abusive, but that's not what the statute seems to think. Your Honor. No, I gather that ASA is no longer a party having settled. No, Your Honor, that's not true. We tried to settle with them. The defendants objected to the settlement, and the district court denied the motion for good faith filing. Well, they denied the motion to get rid of them on statute of limitations grounds. I thought they'd settled, but that's incorrect. No, that's incorrect. So they're still a party. Right. So it wouldn't be possible to make a motion to remand under 1367C3. My request for relief is that, and Your Honor put it more correctly than I did, is that the district court needs to decide the statute of limitations issue, get ASA out of the case. And then consider remand. Yes. So do you want to take any time talking about the merits? I do. You didn't file the right materials under the Northern District of Illinois' rules, and that left us with a factual record that is not very good for you. Well, to tell you the truth, I just blew it. After 37 years of practice, I just blew it. There's no other reason to say it. It was a bad time in my life, and I was ill, and I just blew it. And that's my responsibility, so there's not much I can say about that. I would add one thing about that, Your Honor, and that is that the district court seems to have penalized me, not just for that, but seems to have, without saying it, denied me the right to refer to evidence in the record placed there by defendants. And I don't think that's the purpose of Rule 56.1. I take the responsibility for my failure to introduce my own exhibits, but can't I even refer to depositions that the defendants have introduced? No, you can. But, I mean, what happens in these circumstances, and you're not the first, is that the record becomes the facts before the district court, but that's not the same thing as saying the party who filed the motion wins. It just has to be evaluated. But I'm not sure the district court did what you are accusing it of doing. Well, I hate to use the word accused, but I can point to numerous parts in the record where the district court says, there's no evidence of such and such.  For example, the maintenance manager for Transair, Ted Doyle, he says the GPWS was operational. The district court said there's no evidence of that. Well, there is if you look at Doyle's deposition or if you look at the ATSB report itself. And turning to the merits, I would like to talk about Honeywell's GPWS for a moment. And the defendant, Honeywell, says I have to prove four things. One, that the GPWS was on the accident aircraft. I think I've proven that. I've proved every step of the way the chain of custody. I can point to deposition testimony that says that. Two, that it was operational at the time. And I just touched on that. Ted Doyle from Transair said that if the court referred to that. And the ATSB report said it was probably operational on the aircraft at the time based upon the CVR from prior flights. And three, the defendants say I have to prove a defect. And four, that the pilots would have reacted properly. Now, what they really have a bone to pick with me about is I can't prove a defect. And that's where I think the district court helped me out because the district court found, well, let me back up for a second. The Honeywell witnesses said that the design intent of their GPWS is to give an alert of approaching terrain. But not just any alert, an alert in sufficient time to avoid the crash. That's the design intent, and that's what they testified to. The district court found that the only alert under the best possible circumstances here would have been five seconds before impact, and that would have been insufficient for the flight crew to take evasive action to avoid this crash. So let me ask you this. Your theory of product defect has me a little worried because it seems to me that there are many products that we can imagine that come out, let's say, in version 1.0, and they do certain things. And then the manufacturer goes back and improves it and comes out with version 2.0, and it does more things, just like the extended system does for you. And as I understand your theory, as soon as 2.0 comes out, 1.0 is automatically a defective product, even if it wasn't promising to do the things that 2.0 is now able to do. And I have a lot of trouble with that theory. That's not my theory, though, Your Honor, respectfully. That's not my theory. My theory is that, number one, the GPWS, version 1.0, did not perform as they said it should have. It's supposed to give an alert. But they never did. According to your theory, every airplane that ever had the GPWS on it was carrying a defective product because this time span between getting the alert and running into trouble was so short. No, that's not my theory. The GPWS has saved thousands of lives. It's been a valuable tool, version 1.1. In this case, though, in this particular case, it did not perform as designed and intended. Well, why? I don't understand that at all. Why? I'm totally lost. I thought the Australian Accident Board said that if it had designed as if it had performed exactly as designed, it would have given five seconds notice and that five seconds notice would not have been sufficient to save this plane. Right. So there's no causation, given that finding. Respectfully, Judge, there is causation, in my view, because their intent is not just give any alarm, any alert, but an alert sufficient in time to prevent a crash. It didn't do that. There's the causation. Then we're back to Chief Judge Wood's question. Had this worked exactly as designed and exactly as promised, it would have given five seconds notice, which, given the flight profile and how far they were below the ridgeline, was too late. There are many other accidents, though, where ridgelines might have been different. Maybe this is why it saved so many lives all over the world. It's not always these topographical conditions. Control descent into flat terrain, the first version, would do fine. Control descent where you're already below a ridgeline, it won't do fine. No, that's not true. Sometimes it works, sometimes it doesn't. But they're saying, and they're representing to the air-flying public, it will work every time. That's what they're saying. And when your Honor says that, what's the design intent? Where did they say that? I cited to that in my brief with the testimony of the Sidney Gibson from Honeywell, who said that, yes, this is what we represent to pilots. Where did they say that when they were selling these units, right, that it's a panacea, it will work every time in any conditions? Where did they say that? Well, I'm afraid I can't point to that, Your Honor, frankly. I assume that they handed out specifications saying it will do exactly this. Well, but they were vague about that. That's where the Australian Safety Board came to the conclusion, that had it done exactly what was promised, it would have given five seconds notice. Well, may I talk for a moment about this enhanced ground proximity warning system? You can. You're in your rebuttal time, so I'll just let you choose. Your Honor, I'll talk later about it, if possible. Thank you for your time. All right, fine. Thank you. Mr. Wolfe. Chief Judge Wood, and may it please the Court, I'm Eric Wolfe, counsel for Jeppesen. With me at counsel table is Rich Coyle, and then Austin Bartlett is counsel for Honeywell. I will address issues regarding jurisdiction, any general summary judgment issues, and the Jeppesen issues. Mr. Bartlett will handle Honeywell issues. Appellate jurisdiction logically has to come first, as the Court said. I will just add on the theme of the district court thought it was done, one point that we did not put in our brief. Mr. Wisner had sought an interlocutory appeal on the remand issue, and in the district court's opinion, granting summary judgment, the district court said, I'm denying that motion. It's moot, because the district court was aware that all claims had been decided, and now he had a final judgment from which he could appeal. So that's an additional issue of finality. In terms of count five, as we explained in our brief, Honeywell did mention count five in its motion. It did have a section of its brief devoted to punitive damages, and the kinds of arguments that Mr. Wisner raised about different facts, different theories, things he said in his brief to this court, none of that was raised to the district court. All the district court received from Mr. Wisner on punitive damages was, you know, I think the law of Illinois can apply here. You let me amend my complaint so that Illinois law could apply, and that was it. It was one paragraph. It didn't go into any different facts or anything. So the district court got no argument and no facts because of no Rule 56.1 statement. And remind me, there was or was not a Rule 58 final judgment form? Yes, it's the form, check the box, summary judgment credit. So the district court gave us that hint, more than a hint, as well, that she was finished. Moving on to subject matter jurisdiction, in the briefing below, in the briefing here, and somewhat less so today, Mr. Wisner has said that there's been manipulation, fraud, collusion. I want to speak to that because it may, with the benefit of hindsight, appear to Mr. Wisner like it was some grand scheme and there must be collusion, although he probably knows better. At the time that the third-party claims were made against ASA, ASA had been sued previously in Missouri State Court. ASA did not remove that case. They challenged it on personal jurisdiction. At the time the third-party claims were made in this case, defendants didn't know what ASA would do. All they knew is that it was time to bring ASA into the case. And the reason it was time to bring ASA into the case was that in 2009, ASA had come up with an alternative design for the approach that met all the parameters set by ICAO, I-K-O. And so now there's this issue of was the old approach defective? And that's what the third-party claims are about. So this is this business of who furnished the maps and how you actually approached this air force. Whether you could do it a different way. It was a complicated approach. It was less than optimal in certain respects. And the ATSB report goes into fairly granular detail about those things. But until 2009, there was no determination that you could have a different route. And it is, by the way, after 2009 that everyone starts suing ASA. It's not just the defendants in this case. There is other litigation. And that's when the claims against ASA start to come into the picture. On the statute of limitations question. Can I just ask you something that I find so curious about this case? What is the Illinois connection with this litigation? Was it Boeing or what inspired Illinois? The original complaint included Boeing and Mr. Heyer. Mr. Heyer, as I understand it, and Mr. Bartlett can correct me, a customer service engineer for Hamilton Sunstrand. He has the terrible misfortune of living here. Oh, please, Mr. Wolf, I'm shocked. Well, no, this is why. Because Mr. Wisner has sued him multiple times so that he has a home state defendant. And in all of those cases, Boeing has said this is fraudulent joinery. The only reason he's in here is that he is a home state defendant. And Boeing has also said, in Jeppesen cases, the only reason you're suing Boeing is because Boeing is a home state defendant. And Boeing is a parent, right? It's not the same. Yeah, Boeing is a parent, and Mr. Wisner, as he did in this case, argues that, oh, I could pierce the corporate veil and this, that, and the other thing. The claims have no merit. But the fraudulent joinery standard, as defendants are reminded frequently, is so low that even that type of claim, and even the claim against poor Mr. Heyer, whose credit rating is probably affected by getting sued in so many products liability suits, that even those very meritless claims get over the hurdle. So coming to our claim against ASA, and it's not just our claim, it's Jeppesen, Honeywell, Hamilton, and higher, there is no question about the substantive merit of that claim being frivolous. Mr. Wisner doesn't say that, oh, there's just no claim against ASA at all. It's only that it's untimely. And I will confess in writing the brief, the standard is so low I did not know how much I should get into all the complexities of that claim. There is a brief below on it. It's a docket 44. It's actually fairly complicated to figure out what choice of law test to apply. And then for the reasons just given, there's no basis for applying Illinois law. And Illinois has this very unusual contribution rule where it's two years, and the clock starts running once you know that you could have an injury, which might be at the time of filing suit. Most contribution statutes run from when there's a judgment against you. And, in fact, that's how the Queensland statute works. So you're supposed to guess, based on the plaintiff's complaint, whether somebody else should be brought in because they're at fault. So their complaint is not about the design or the approach. Their complaint actually doesn't point the finger at ASA in any respect. And the ATSB report doesn't either. Their complaint is about the layout of the Jefferson charts. So you could have used different fonts. You shouldn't have had the profile. This is the putting the contours and color and so on? Yes. And the contours and color of the ASA chart doesn't have those either. But, yes, you could do all these different things. There is no allegation that the chart was inaccurate in any respect. And, in fact, that is an undisputed fact, the chart was accurate. But there are these issues that, I mean, we believe are pretty trivial regarding the chart. And it is an undisputed fact as well that the pilots were familiar with Jefferson charts and knew how to use them, and they knew that this approach came over a mountainous area. That's an independent statement of facts. But there's this issue of the alignment of the plan view. But there's some 5% deviation? Yes. So the chart is at Supplemental Appendix 1. And if you see the approach line come in, and then there's a little white rectangle that is the runway, and you can see that it's bent just a little bit to represent 5 degrees, what ATSB said was, well, you could have had like a little notation that says 5 degrees so that you know that it's 5 degrees off. Pure speculation whether something like that would make any difference. That doesn't seem to have a whole lot to do with this accident, actually. None of it does. None of it does. And it is very unfortunate, but as the ATSB recognized, we will never know. A big chunk of the report goes through different theories of sort of why did they lose situational awareness, and it sort of rejects some of them, like maybe they were trying to shoot through a hole in the clouds to get visibility. But they don't know, and it's because there's no cockpit voice recorder. There was no back and forth with the control tower in the last three minutes. All they have is this flight data. They know there was some turbulence. That's it. That's all they know. And there's just no link, and certainly on this record where he has no facts and evidence, no expert opinion and evidence, that any of those things in the chart mattered or were causally linked. And just to go back to the statute of limitations question and address one other thing that came up. Statute of limitations is an affirmative defense. And yes, I suppose you could have a case where it is so clear that it's untimely, something that happened 20 years ago, 100 years ago. It would be totally frivolous. Here, ASA moved to dismiss. It was fully briefed. That was denied. Judge St. Eve treated that as really the end of the issue. And, in fact, she denied this fraudulent joinder remand motion, which, by the way, was outside of 30 days. She denied it without even getting a brief from defendants because she had already read all this briefing on the motion to dismiss on statute of limitations. And she treated it, as most courts do, that if you can survive a motion to dismiss, then it's clearly not fraudulent to join. But then at that point, as the case went on, and ASA litigated against defendants on different things, but ASA eventually decided that it was going to stand back and see what happened. I'm just guessing here. I mean, I don't actually know. But they did stand back, and defendants' motions for summary judgment were decided.  Because winning on a two-year statute of limitations in Illinois does them very little good somewhere else in the world where it's a longer statute of limitations. But having defendants win on liability against these plaintiffs, that's a very good result for them. And as a foreign sovereign under the FSIA, they are entitled to a federal forum, and they are entitled to their own litigation strategy to try and get the federal judgment that they want. And it's probably quite reasonable to assume they got that eventually. They got a judgment that they would have probably liked a lot more than getting out on a motion to dismiss on statute of limitations. So those are their choices to make, and they're entitled to those choices under the statute. It's not plaintiffs' choice to make, where they should be and how they should litigate their case. Oh, one last issue. Mr. Weisner talked about how he wasn't allowed to cite evidence that defendants put in the record, and I just want to make clear what happened there. When Jeppesen and Honeywell put together their statement of material facts, they cite things, and they have exhibits that support what they cited. They didn't put in, like, the entire deposition transcript for someone. They put in the relevant pages. District Court relies on that fact as stated, as 56.1 says is proper. His argument is, okay, you cited that deposition. I get to go elsewhere in it and just find something. That's improper, and the District Court didn't abuse its discretion in just not considering any of that. Unless there are any questions, I'll turn it over to Mr. Bartlett. Okay, that's fine. Thank you. Thank you. Good afternoon, Judge Wood. Good afternoon, Judge Easterbrook and Judge Williams. Austin Bartlett on behalf of the Pelley Honeywell International, Inc. As we've just heard Mr. Wiesner say, he failed to comply with Local Rule 56.1, and that is governed by an abusive discretion standard, and his briefing below, I'm sorry, his brief on appeal, does not in any way contend with that standard or suggest that the District Court abused its discretion. He does mention a few things that I thought maybe you could talk about. So the ATSB talks about a number of potential causes of the crash, and it uses this idea of a 66% probability, and then it has this other list of things that it thinks might also have had something to do with it that seemed to be below that. But as I understand Mr. Wiesner, he's saying, well, you know, that's not the standard of proof in a federal court action. It's a 51% probability. So did the District Court make a mistake by looking at those things, giving them too much weight, essentially? No, Your Honor. I think Mr. Wiesner is taking liberties with the District Court's opinion. The District Court did not in any way treat the ATSB's contributing factor quantum as congruent with Illinois' burden of proof. The Court was looking at the ATSB report because it had excluded all of his evidence due to the local rule 56.1 violation, and it looked at that report to see if there was anything in there that could help him. And the answer is it doesn't because, as you just stated so clearly, there are a variety of scenarios that are presented in the ATSB report. As Mr. Wolf just said quite articulately, the ATSB, due to the absence of a cockpit voice recording, could not state what happened. And I think this gets into part of what happened below. Due to the rule 56.1 violation, all of Mr. Wiesner's expert affidavits were disregarded. And as this court held in Show v. Ford Motor Company, in a case where you're bringing a design defect with complex products that are beyond the scope of layperson's knowledge, you need expert testimony. Otherwise, your case depends on speculation. And that's 659 F. 3rd at 588. We know that principle. So let me ask you this. As I understand, this crash happens, and then there's like a terrific fire, right? There's a great deal of damage. Do we know that the fire would have destroyed evidence that a GPWS device was there or could have melted the flight voice recorder? Do we know anything about why none of these things are found? There was a fuel-fed fire, and most of the wreckage was destroyed. And so no GPWS was recovered. It is certainly possible that a GPWS was burned in the fire. We don't know. Why don't we know that? We should be able to tell at what temperature the metal in that device would melt, and we should be able to tell at what temperature the fire was burning so we would be able to know whether it would survive or not.  You say it is. All that I'm saying, Your Honor, is that it was not recovered from the wreckage. Right. But the question both the Chief Judge and I are asking is, would it have been recovered given what its materials were and given the temperature of the fire if it had been there? I think given the fire, I don't know the answer to that. I don't know the answer. What I would say is it is not unlike a cockpit voice recorder or a flight data recorder. It's not hardened, I understand. Correct. But we know what materials it contained, and we know what the melting temperature of such materials was. This is something we should be able to figure out, put two and two together. Right. Because, of course, if this plane just was out of compliance in all sorts of ways, whether it was the copilot not having the correct instrument training or whether it was nobody putting the GPWS device in that day. I mean, I don't know how easy they are to take in and remove, but something obviously goes wrong, and it would be helpful to know better what it is. Well, I think, as you just touched upon, Your Honor, by all indications, this was a pilot error case. Pilots that were flying too fast, too low. A copilot wasn't endorsed to fly this type of approach. It was a high workload environment. The ATSB thought that even if a GPWS was on this aircraft, that an alert would have likely been disregarded by the pilots, not only because they weren't trained by their employer, but also because of the inexperience of the copilot. And the workload with this type of RNAV approach. So, in this case, there is just speculation because there's no expert testimony to establish that any of the products at issue here were unreasonably dangerous or that they were a cause of this accident. So just as in the show case, which this Court is well aware of, in this case, the District Court's summary judgment finding in favor of the defendants should be affirmed. So can I ask you one more question? Yes. Do we have in the record any satisfactory chain of transactions for this GPWS device from when it was first sold to the first airline? It seems like maybe it's some leasing company that bought it and then it went to the Mexican carrier and then over to Australia. I'm not sure whether that's fully traced. The answer is no. Honeywell's record is that in September of 2000, there was an internal shipment to another Honeywell facility. There is no record, and plaintiffs have both admitted by operation of Rule 56.1, and I believe also on page 32 of the brief, they say they don't object to any of our statements. There is no record of Honeywell communicating with Transair or the initial purchaser, AeroLittoral. So there is no evidence to suggest that there was any request of Honeywell to explain the differences between a GPWS or an eGPWS as plaintiffs' entire case is built on, as I think this court talked about. Although I see I'm out of time. Please finish your thought. If I could just conclude, I think the court quite rightly said that Mr. Wiesner's case seems to be the difference between product 1.0 and product 2.0. He's now trying to distance himself from that, but that is his theory, and it was properly rejected. Summary judgment should be affirmed. Thank you. All right. Thank you. Anything further, Mr. Wiesner? Yes, please. Your Honor, responding to your question, your last question first, usually Mr. Bartlett's a straight shooter, but he's just darn wrong about the chain of custody question. I've said it right in my brief. I took depositions that showed when that GPWS was first installed on the accident aircraft, when it went from the Mexican airline to the leasing company, the leasing company representative testified that it was on there. When they sold it to Partnership 818, which was an Australian partnership, they both testified it was on there, and when it was sold to TransAero, they all said it was on there. And is the fact that it's on there enough to give Honeywell some lengthy continuing duty to warn about, or duty to, maybe warn is even too strong a word, but duty to inform each customer down the line about what this system does? No. I think the duty to warn is dependent upon did they know of the defect at the time of the sale. Which sale? The first sale or the last? First sale. First sale. They knew of that defect at the time of the first sale, and that's a very important point, Your Honor, because, and I bring that out in my brief or try to, at the time they sold this GPWS to the Mexican operator, it was obsolete. They said it was obsolete. They had a company directive that said do not sell this anymore, and they sold it one year later. That's very important. So that gets to my version 2.0 argument. It's not that they have a better product to come out and they have to go search everybody to tell them the better product. That's not what I'm saying. I'm saying at the time they sold this GPWS, it was obsolete. They said it was obsolete. They said not to sell it, and they sold it to this Mexican operator. But there's no worldwide recall on these things, is there? No, but you can stop selling them. But you're implying that there should have been if it was a gas trap. No, not at all, Your Honor. I'm saying that when you tell your company don't sell it, then don't sell it. The reason why they told their company not to sell it is because it was obsolete, and I think obsolete means they've recognized it's no good anymore. There is a version 2.0. And, Your Honor, I want to touch on something else too. The district court did more than one occasion refer to the 66% burden of proof. The district court could have just said the ATSB report found this or didn't find that. Instead, she made a point of talking about contributing safety factor and what it is, 66%. That's clearly not the burden of proof under Illinois law, and I think the district court did that. And that comes to play in both the case against Hamilton, Sunstream, Honeywell, and Jefferson. It's the wrong burden of proof. I think the district court erred on that one. And also, Your Honor, we talked about wreckage and the GPWS not being found. That's not unusual in airplane crash cases because there were other parts here that also were not found as well as the GPWS. Do you know the answer to the question what materials were in it and at what temperature were they built? I listened with interest to that question. I don't know the answer either. But I will say that other parts also were not found. So I think the fact that it was not found does not mean it wasn't on the airplane. Everybody says it was on the airplane. It depends on the melting temperature. Pardon, Your Honor? It depends on the melting temperature. Sure it does. Sure it does. But I think that, you know, they talked about pilot error. Well, yeah, the pilots were going too fast and descended below the minimum safe altitude. But that's why you have a GPWS. It's called the last line of defense. You don't need it when you're flying over the cornfields of Iowa. You need it when the pilots goof up. All right. If you would like to just conclude with one sentence, we will. Well, my only conclusion, Your Honor, is that 15 people died in this crash and that I think they're entitled to their day in court if the correct standard of proof is applied with reasonable, with an inference of probability rather than probability and with 51 percent rather than 66 percent. Thank you, Your Honors. All right. Thank you very much. Thanks to all counsel. We'll take the case under advisement. Court will be in recess.